**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**
---------------------------------------------------------X
THERESA KOHUTKA,

                        Plaintiff,

            -against-

THE TOWN OF HEMPSTEAD, CHARLES
MILONE, JOHN ALLBACK, CHRISTINE
REEKE, DEBRA BOVE, and BRIAN
BRACCIO,

                        Defendants.
---------------------------------------------------------X

**MEMORANDUM OF**
**DECISION AND ORDER**
11-cv-1882 (ADS)(WDW)

**APPEARANCES:**

**The Law Offices of Steven Morelli**
*Attorneys for the Plaintiff*
1461 Franklin Ave.
Garden City, NY 11530
            By:     Steven A. Morelli, Esq.,
                    Joshua S. Beldner, Esq., Of Counsel

**Jaspan, Schlesinger, & Hoffman, LLP**
*Attorneys for the Defendants Town of Hempstead, John Allback, Christine Reeke,*
*Debra Bove, and Brian Braccio*
300 Garden City Plaza
Garden City, NY 11530
            By:     Lisa Cairo, Esq.,
                    Laurel R. Kretzing, Esq., Of Counsel

**Law Offices of Dennis M. Lemke**
*Attorneys for the Defendant Charles Milone*
114 Old Country Road
Suite 212
Mineola, New York 11501
            By:     Lawrence V. Carra, Esq., Of Counsel

**SPATT, District Judge.**

The Plaintiff in this case, Theresa Kohutka ("Kohutka" or the "Plaintiff"), commenced this action on April 15, 2011 against the Defendants the Town of Hempstead (the "Town"), Charles Milone, John Allback, Christine Reeke, Debra Bove, and Brian Braccio, asserting causes of action pursuant to 42 U.S.C. § 1983; the New York State Human Rights Law ("NYSHRL"), New York Executive Law § 296 *et seq.* and the Nassau County Human Rights Law ("NCHRL").

On August 5, 2011, the Defendants moved pursuant to Federal Rule of Civil Procedure ("Fed. R. Civ. P.") 12(b)(6) to dismiss the complaint for failure to state a claim upon which relief can be granted. By Memorandum of Decision and Order dated March 20, 2012, this Court denied that motion.

On October 17, 2013, the Town, Allback, Reeke, Bove, and Braccio moved pursuant to Fed. R. Civ. P. 56 for summary judgment dismissing the complaint. On that same day, Milone moved separately for the same relief. The Plaintiff opposes the respective motions. For the reasons set forth, the motions are granted in part and denied in part.

## I. BACKGROUND

A. <u>Factual Background</u>

Unless stated otherwise, the following facts are drawn from the parties Rule 56.1 Statements and the materials submitted therewith. Triable issues of fact are noted.

1. <u>The Parties</u>

On June 8, 1987, the Plaintiff commenced her employment with the Town as an account clerk at the Town's Animal Shelter. The Plaintiff was promoted to clerk typist in 1988, and promoted to Animal Control Officer ("ACO") in 1989.

The Town is a municipal corporation located in Nassau County established pursuant to the laws of the State of New York.

Milone is a former employee of the Town who retired on April 29, 2011. Milone has been a member of the Republican party for 39 years. From 1973 to 1987, Milone was a member of the Island Park Republican club. From 1987 to the present, Milone has been a member of the Seaford Republican club. Milone held the position of committee person. A committee person gathers petitions, assists on campaigns and in fundraising, and brings in new members to the club. Milone has been the Executive Leader of the Seaford Republican club since 2000. An Executive Leader is the highest ranking official of the club. For this reason, Milone is aware of which members of his club are more "active." (Milone Dep. Tr., at 23.)

Milone began his employment at the Town as an Electrical Service Supervisor. Less than one year after obtaining employment at the Town, Milone was appointed to the position of the Third Deputy Commissioner of the Department of General Services ("DGS").

Between 2003 and October 25, 2010, Milone held the employment title of Acting Director of the Town's Animal Shelter. In this capacity, Milone was responsible for making decisions with respect to disciplinary issues. Milone also had authority with respect to hiring decisions. As to open civil service positions,

Milone would conduct interviews and make recommendations. However, after October 25, 2010, Milone had no duties with respect to the Shelter.

Allback is an employee of the town whose current title is ACO. Allback became a member of the East Meadow Republican club in 1997, and has maintained membership in that club "on and off" for a number of years.

Reeke is an employee of the town whose current title is ACO. Reeke was a member of the Bellmore Republican club, and then later joined the Wantagh Republic Club. Reeke was admittedly "active" in the club until about 2011 or 2012 because, as she testified, "I don't believe in joining things to get positions. I believe you work for what you earn, not who you know." (Reeke Dep. Tr., at 17.) Reeke spoke to Milone about which club she should join. Milone told her that other employees at the shelter belonged to the Wantagh club, so she joined that club.

Bove is an employee of the town whose current title is Kennel Supervisor I. From 1986 to 1994, Bove held the position of Kennel person. Bove became an ACO in 1994. Bove was promoted to Kennel Supervisor I in 2010. Bove does not have a college degree and never took any management training courses.

In 1986, when Bove first started working at the Town, she joined the Valley Stream Republican Club. In 2007 or 2008, Bove joined the Malverne Republican club. Since joining the Malverne club, Bove has been a committee person. Bove testified that employees at the shelter talked about their respective Republican clubs.

Bove became "active" in her club shortly before she took the March 2009 promotional exam. Bove testified that she thought it was important to be affiliated

with a club while seeking a promotion. According to Bove, Milone would often talk about Republican matters, and she knew that he was very active in the Republican party. At the time she took the promotional exam, Bove had the understanding that Milone would be making the selection and Milone knew that Bove was a member of a Republican club.

Braccio is a part-time employee of the Town. Braccio works at the Town Animal Shelter as a night watchman.

2. Alleged Hostile Work Environment

All Town employees, including Kohutka and Allback, received training with respect to the Town's policy prohibiting sexual harassment in the workplace. Kohutka received this training in 1993 and 2008. Despite this training, a number of troubling incidents, some of which are undisputed, arose involving the parties and other Town employees, beginning with an incident on April 16, 2008.

Prior to that date, Kohutka and Allback were friends, went camping together, and were civil to each other. Allback testified that he had a sexual relationship with Kohutka over the course of a year which ended in December 2007. Records of Allback's cellphone demonstrate that, during 2007, Kohutka and Allback contacted each other via the telephone more than 2,000 times. Kohutka denies that she had a sexual relationship with Allback.

On April 16, 2008, an unusually vicious argument erupted between four Shelter employees: Kohutka, Allback, Reeke, and Ken Morrison, an ACO who was Kohutka's romantic partner at the time. The argument began because, according to Kohutka, she wanted to give Allback a "dig" based on the fact that, a few days

5

earlier, Reeke and Allback gave one of their supervisors, Pat Horan, a 50th birthday gift. (Kohutka Dep. Tr., at 35.)  Kohutka "knew this was a . . . butter-up thing, so she called (Allback) out on it [on April 16, 2008] and he got upset."

That day, in order to give Allback the "dig," Kohutka brought a soda and bag of chips for another supervisor, Gary Shaw, for his birthday.  Kohutka presented the gift to Shaw in the presence of Reeke, Allback and Bove, among others.  Kohutka said, "I don't have to sneak around to butter up the boss."  By giving Shaw the card, the Plaintiff admittedly intended to provoke a response from Allback.

Allback responded, calling Kohutka a "f***ing c*unt" in front of multiple supervisors and approximately seven employees, after which Kohutka told Allback to "chew your fucking fingers off." (Id. at 29.)

According to Allback and Reeke, Kohutka provoked the comment from Allback by calling him a "sneaky pussy" (Allback Dep. Tr., at 23.), a comment which Kohutka does not recall making.

In any event, an argument ensued between several employees.  At one point, Morrison and Kohutka made comments regarding Reeke's personal problems relating to bulimia and cutting, which she had previously confided about to Kohutka.  However, Kohutka claims that she attempted to diffuse the situation by pushing Morrison out of the room.

In response to the incident, the supervisors who had witnessed it, John Christianson and Shaw, called all four participants into their offices separately; admonished them about their behavior and the personal nature of the comments to

each other; and drafted an Incident Report. Kohutka testified that she met separately with Milone, at his request. The Plaintiff told Milone that she was offended by the comments made by Allback.

However, in response to Milone's question as to whether she wanted to press charges against Allback, the Plaintiff declined. Milone did not attempt to encourage Kohutka to press charges or file a formal complaint. Rather, Milone testified that he believed that there was a formal investigative report prepared regarding the incident, but he never saw a copy.

Milone also met with Allback privately on April 16, 2008 and told Allback that he could not use that type of language in the workplace.

Special Investigator Raymond Enright did not conduct an investigation into the April 16, 2008 incident until May 14, 2008, at which point Enright advised Allback that he could not use that type of language at the workplace. Enright did not prepare a report regarding the incident. According to Enright, his investigation into the incident "didn't last long." (Enright Dep. Tr., at 29.). Enright testified that, once Allback admitted to making the comment, there was no reason to further investigate the matter. Enright is also a registered Republican.

Enright testified that it is part of his duties and responsibilities to write memoranda; report his findings; and to make recommendations regarding discipline. Following an investigation, Enright customarily informs the complainant of the resulting findings and the punishment, if any. However, for purposes of the April 16, 2008 incident, Enright could not recall informing the Plaintiff of his findings. Nor did Enright recommend that Allback be disciplined,

and Allback was, in fact, not disciplined.  Instead, Milone advised Allback to avoid future confrontations.

Following the April 16, 2008 incident, at least four anonymous letters were circulated throughout various Town offices.  The letters concerned Allback; referenced the April 16, 2008 incident; and accused him of (1) sexual harassment of women in the workplace and (2) sexual relations with Reeke during the work day, as well as accused Milone of permitting this sexual harassment to continue.  The Plaintiff denies writing any of the letters.

Based on the accusations set forth in an anonymous letter on May 14, 2008, Enright launched an investigation of Allback.  Numerous witnesses stated to Enright that they believed Kohutka authored the anonymous letters; that Kohutka was a flirt; and that she had exposed her breasts and her butt in the workplace.  The Plaintiff denies these allegations.  The Plaintiff concedes showing a co-worker a tattoo on her back, but claims that such acts were commonplace at the shelter.

Approximately two months after the anonymous letter was distributed, Allback alleged to Enright that Kohutka had previously grabbed his testicles while he was talking to Horan about a medical problem he was having.  The Plaintiff denies this allegation.  Kohutka was ultimately suspended for three days based on the allegation that she grabbed Allback's testicles.  However, on October 21, 2008, at a subsequent hearing related to this incident, the charge was dismissed against Kohutka in its entirety, and her suspension was reversed.  Allback was never disciplined for making these allegations.  The Plaintiff testified that Allback

accused her of grabbing his testicles in order to "make me look bad, supervisors test was coming out, to put me in a bad light." (Kohutka Dep. Tr., at 40.)

Thereafter, the relationship between Kohutka, Reeke, Allback, and their respective friends and supporters in the workplace deteriorated.

For example, on June 30, 2009, the keys to the Plaintiff's personal car were stolen and never returned to her. The day her keys were stolen, Kohukta had left the keys on a desk at the animal shelter near where Reeke sat. The Plaintiff alleges that Allback and Reeke were responsible for the keys disappearing. The Plaintiff filed a police report regarding the missing keys, but the keys were never found.

The Plaintiff also alleges that, on a daily basis, Reeke and her friend would congregate by the Plaintiff's truck when she pulled into the parking lot, and stand in her way as a means of intimidating her. The Plaintiff also claims that Reeke would spit at her as she walked by. As reprisal for harassment that the Plaintiff felt she received from her co-workers, the Plaintiff admitted to doing "stupid little things," such as moving her coworkers' paperwork.

On July 28, 2009, the Plaintiff attended a Republican dinner with several of her co-workers. At this dinner, Reeke apparently accused Kohutka of having an affair with Mike Errico, Kohutka's former work partner. Reeke related this information to Milone, which greatly upset Kohutka because she was close friends with Erricos' wife. Kohutka claims that Milone told her to "shrug it off," because he thought she had "thick skin." (Id. at 206-07, 56.) Kohutka testified that the incident occurred offsite and, thus, she thought filing a formal complaint would have been futile.

Kohutka further alleges that Bove tailgated her for seven miles on July 27, 2010.  Kohutka states that she was in fear at the time and that Errico witnessed the incident.  Kohutka claims that this incident constituted harassment based on her gender because Bove "doesn't have the balls enough" to tailgate a man.

On July 28, 2010, Kohutka approached her work truck and noticed that the box number tag on her gun box, which contained all of her drugs and tranquilizer guns, was clipped.  Kohutka complained about the incident to Milone and told Milone that she believed it was done by Allback and Reeke in retaliation for mentioning their names when she previously spoke to Milone.  However, again, nothing was done about this incident.

On December 10, 2010, a community representative named Joanne Miranda, who is politically active in the Republican party, confronted the Plaintiff at a union Christmas party.  The Plaintiff claims that Miranda called her a "f***ing bitch." (Id. at 88.).  The Plaintiff alleges that the Town never reprimanded Miranda for this remark.

After leaving the Christmas party, Kohutka's car was pulled over and her husband was asked to do a field sobriety test.  Kohutka alleges that Miranda had called her contact at the Nassau County Police Department to tell them that Kohutka's husband had been drinking at the party and was now driving home drunk.  Kohutka wrote to the New York State Police Department concerning her husband and her family getting pulled over and scrutinized.  Kohutka alleges that she received no response from the New York State Police Department with regard to the letter.

The Plaintiff mentioned this incident to Milone but did not ask him to investigate it or discipline anyone and did not tell any other supervisors.

On February 23, 2011, based upon a complaint by Reeke and after an investigation by Enright, Kohutka was disciplined for striking Reeke at the shelter and letting a "nasty" dog attack her. Reeke testified that Kohutka was jealous of her because she and Allback were involved in a sexual relationship and Kohutka had previously had a sexual relationship with Allback. Kohutka claims that the accusations were untrue. Kohutka received a three-day suspension which she thereafter appealed. The suspension was reduced but not rescinded after a hearing before the Town Disciplinary Review Board.

3. Alleged Deprivation of Freedom of Speech and Association

The Plaintiff also claims that she was denied overtime opportunities during her employment. In December 2009, Braccio was working as a watchman, which is the individual who calls the ACOs to work overtime at nights or on the weekends. The Plaintiff alleges that Braccio repeatedly passed over Kohutka when making calls from the overtime work list. Upon learning that she was being deprived of overtime pay, Kohutka called Braccio to ask why she was not being called for overtime work. Braccio reported to Milone that Kohutka had called and yelled at him. Kohutka was written up for this incident, but Braccio was never disciplined or punished for his actions.

The Plaintiff testified that Braccio discriminated against her because she was a woman and because she was "not in the political crowd." The Plaintiff was called for overtime by night watchman other than Braccio. Braccio insists that he

skipped over Kohutka on the overtime list because she told him that because she lived in East Northport, she did not want to be called at night to return to Nassau County.

Dominick Acuri, the Shelter Maintenance Supervisor, told Milone that the overtime list was followed correctly and that Kohutka had requested in the past not to be called. The Plaintiff notes that Acuri is a member of the Republican party. The Plaintiff alleges that Horan gave extra overtime to Allback, Reeke, and others because they were more politically active than the Plaintiff.

The Plaintiff spoke with Enright about these allegations but Enright did not complete a written report regarding any investigation that he conducted into the unfair overtime allegations raised by the Plaintiff. The Plaintiff also complained to then Town Commissioner Bruce Halbert about how the overtime list was being used and that she was being skipped over for overtime work.

On February 24, 2011, within two weeks of the Plaintiff's complaint to the Town Commissioner regarding the distribution of overtime, Kohutka was told that she was being written up and was being suspended for three days without pay. Kohutka was told that she was being written up because of another incident. However, Kohutka alleges that she was written up for complaining about the unfair allotment of overtime work.

The Plaintiff also alleges that, during her employment, representatives of the Town, including Milone, consistently encouraged her to be active in the local Republican Party. Kohutka alleges that, although it was not usually openly discussed, it was known among all the Town employees that it was necessary for

them to be involved with the Republican Party if they wanted to get promoted or otherwise advance in their jobs.

In March 2009, the Plaintiff took the supervisor test, an examination to qualify for a promotion to a supervisor position. Kohutka alleges that, about this time, although she does not state precisely when, Milone told her that in order to be promoted, she should get more involved in the Town Republican Party. Kohutka claims that because Milone was part of the committee who hired and promoted employees in the Town, this statement demonstrated a clear *quid pro quo* between Republican involvement and advancement in her position. The Plaintiff alleges that although she initially joined the Town Republican Club and attended some Republican Club events, she decided she did not want to be actively involved in the Republican Party and thus she stopped attending political meetings.

In August 2009, the Plaintiff was notified that she received the highest grade on the supervisor test. Kohutka alleges that she believed that earning the highest grade would help her attain the supervisor position, because the last time Kohutka took the test, the person with the highest score was promoted to a supervisory position. However, in November 2010, Bove was given the supervisor position over the Plaintiff, although Bove had received the second highest score on the supervisor test. At an unspecified time, Bove's husband, Guy, was promoted to a supervisor position, even though he also had a lower score than Kohutka on the supervisor test. According to the Plaintiff, both Bove and Guy are actively involved in the Republican Party. By contrast, at the time the promotional exam was given, the Plaintiff was not politically active at all.

Further, according to a promotional list, Kohutka had more "seniority credit" than both Bove and Guy. Indeed, while the Plaintiff was promoted to the ACO position in 1989, Bove assumed that position five years later, in 1994.

Kohutka claims that Milone told her that Bove was "politically pushing" for the supervisor position. Milone testified that he did not tell the Plaintiff to join a club nor did he tell her to become more activity politically.

Bove testified that she became active in the Malverne Republican club because she was seeking a promotion. Bove testified that she thought it was important to be affiliated with a club while seeking a promotion. The Plaintiff alleges that Horan told her that the Plaintiff would probably have a difficult time obtaining the position because Bove held the position of "committee person" in her local republican club.

Having been passed over for a promotion, Kohutka was deprived of a higher pay grade.

4. The Plaintiff's Current Employment Status

From March 22, 2011, Kohutka has been on administrative leave from her position as an ACO and has been assigned to the CSEA Local 880 ("CSEA") office. CSEA is a union that represents Town employees. Kohutka's current placement with the CSEA is the result of her agreement to such placement after consultation with Charles Sellitto, the CSEA president, shortly before this lawsuit was commenced. Kohutka has not submitted a formal request to be reassigned to the Shelter. The Plaintiff did discuss the option of returning to the shelter in May 2011,

but Selitto stated that if she returned, the work environment would be hostile, and suggested that it would be in her best interest to remain at CSEA.

B. Procedural History

On April 15, 2011, Kohutka filed the instant complaint against the Town, Milone, Allback, Reeke, Bove, and Braccio, asserting that the Defendants violated 42 U.S.C. § 1983 with regard to her First Amendment and Fourteenth Amendment rights, the NYSHRL, and the NCHRL. On August 5, 2011 pursuant to Fed. R. Civ. P. 12(b)(6), the Defendants filed a motion to dismiss the complaint in its entirety for failure to state a claim.

By Memorandum of Decision and Order dated March 20, 2012 ("Mem & Order"), this Court denied that motion. Of relevance here, the Court first found that the Plaintiff adequately pled that her alleged conduct in not affiliating with a political party qualified as activity protected under the First Amendment. The Court further found that the Plaintiff adequately pled an adverse employment action in that she was passed over for a promotion.

As to the denial of overtime opportunities, the Court noted that "[t]here is nothing to suggest that these overtime opportunities held any relation to Kohutka's professional growth or to any career advancement." (Mem & Order, at 14-15.) "Nevertheless," the Court determined, "allegations that she was being denied overtime pay, even on one occasion, may be sufficient to deter a similarly situated individual of ordinary firmness from exercising his or her constitutional rights so as to constitute an adverse employment action." (Id. at 16.) Therefore, the Court

concluded, the Plaintiff adequately pled an adverse employment action in that she was denied overtime opportunities.

The Court also found that the Plaintiff sufficiently alleged a causal relationship between the Plaintiff's protected activity and the fact that she was passed over for a promotion. In this regard, the Court noted that the two individuals who were promoted over Kohutka were allegedly actively involved in the Republican Party, and both were promoted over Kohutka even though both received lower grades on the supervisor exam. Accordingly, the Court found that the Plaintiff pled a *prima facie* case of first amendment discrimination.

However, the Court declined to find that the Plaintiff adequately pled the requisite causal relationship between her protected activity and the denial of overtime opportunities. In this regard, the Court emphasized that the Plaintiff failed to allege any circumstances in which Braccio was aware of her lack of political involvement.

Turning to the Defendants' burden to articulate a legitimate non-discriminatory reason, the Court acknowledged the Defendants' argument that the Town acted within its rights under New York Civil Service Law when promoting someone other than the Plaintiff to supervisor. However, the Court found that the Defendants could not prevail at the motion to dismiss stage by merely alluding to possible non-retaliatory reasons for their conduct, which may ultimately be shown to be pretext, particularly where, as here, it was unclear where Guy ranked on the supervisors test.

The Court next considered the Plaintiff's Section 1983 Equal Protection claims for creating a hostile work environment based upon the Plaintiff's gender and political associations. The Court held that, viewing the totality of the circumstances, Kohutka pled a series of incidents that were sufficiently hostile or abusive based on political affiliation and gender. Indeed, the Court noted that the confrontation between the Plaintiff and Allback and his subsequent false accusations of unwanted sexual conduct, standing alone, would likely suffice to state a hostile work environment claim.

The Court further found that Plaintiff stated a claim for her Section 1983 First Amendment retaliation and Equal Protection Hostile Work Environment claims against the Town on the theory of Monell liability.

Finally, the Court found that the Plaintiff could continue to pursue her state law claims under the NYHRL and NCHRL based upon gender-related discrimination.

On October 17, 2013, the Town, Allback, Reeke, Bove, and Braccio moved pursuant to Fed. R. Civ. P. 56 for summary judgment dismissing the complaint. On that same day, Milone moved separately for the same relief. The Plaintiff opposes the respective motions.

## II. DISCUSSION

A. Legal Standard on a Motion for Summary Judgment

"Summary judgment pursuant to Rule 56 is only appropriate where admissible evidence in the form of affidavits, deposition transcripts, or other documentation demonstrates the absence of a genuine issue of material fact, and

one party's entitlement to judgment as a matter of law." Clarke v. Nassau Health Care Corp., 08-CV-2400 (DRH)(GRB), 2013 WL 6572540, at *3 (E.D.N.Y. Dec. 13, 2013). No genuinely triable factual issue exists when the moving party demonstrates, on the basis of the pleadings and submitted evidence, and after drawing all inferences and resolving all ambiguities in favor of the non-movant, that no rational jury could find in the nonmovant's favor. Chertkova v. Conn. Gen. Life Ins. Co., 92 F.3d 81, 86 (2d Cir. 1996) (citing Fed. R. Civ. P. 56(c).)

To defeat a summary judgment motion properly supported by affidavits, depositions, or other documentation, the non-movant must offer similar materials setting forth specific facts that show that there is a genuine issue of material fact to be tried. Rule v. Brine, Inc., 85 F.3d 1002, 1011 (2d Cir. 1996). The non-movant must present more than a "scintilla of evidence," Delaware & Hudson Ry. Co. v. Consol. Rail Corp., 902 F.2d 174, 178 (2d Cir. 1990) (quoting Anderson, 477 U.S. at 252), or "some metaphysical doubt as to the material facts," Aslanidis v. U.S. Lines, Inc., 7 F.3d 1067, 1072 (2d Cir. 1993) (quoting Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586–87, 106 S. Ct. 1348, 89 L. Ed. 2d 538 (1986)), and cannot rely on the allegations in his or her pleadings, conclusory statements, or on "mere assertions that affidavits supporting the motion are not credible." Gottlieb v. Cnty. of Orange, 84 F.3d 511, 518 (2d Cir. 1996) (internal citations omitted.)

In considering a summary judgment motion, the district court must also be "mindful of the underlying standards and burdens of proof," Pickett v. RTS Helicopter, 128 F.3d 925, 928 (5th Cir. 1997) (citing Anderson, 477 U.S. at 252),

because the evidentiary burdens that the respective parties will bear at trial guide district courts in their determination of summary judgment motions. <u>Brady v. Town of Colchester</u>, 863 F.2d 205, 211 (2d Cir. 1988). Where the non-moving party will bear the ultimate burden of proof on an issue at trial, the moving party's burden under Rule 56 will be satisfied if he can point to an absence of evidence to support an essential element of the nonmovant's claim. <u>Id.</u> at 210–11. Where a movant without the underlying burden of proof offers evidence that the non-movant has failed to establish her claim, the burden shifts to the non-movant to offer "persuasive evidence that [her] claim is not implausible." <u>Id.</u> at 211 (citing <u>Matsushita</u>, 475 U.S. at 587.)

Summary judgment is generally inappropriate where questions of the defendant's state of mind are at issue, <u>Gelb v. Bd. of Elections of the City of N. Y.</u>, 224 F.3d 149, 157 (2d Cir. 2000), and should thus be granted with caution in employment discrimination cases. <u>Gallo v. Prudential Residential Servs., Ltd. P'ship</u>, 22 F.3d 1219, 1224 (2d Cir. 1994); <u>Carlton v. Mystic Transp., Inc.</u>, 202 F.3d 129, 134 (2d Cir. 2000). Nonetheless, "summary judgment remains available to reject discrimination claims in cases lacking genuine issues of material fact." <u>Chambers v. TRM Copy Ctrs. Corp.</u>, 43 F.3d 29, 40 (2d Cir. 1994). "The summary judgment rule would be rendered sterile . . . if the mere incantation of intent or state of mind would operate as a talisman to defeat an otherwise valid motion." <u>Meiri v. Dacon</u>, 759 F.2d 989, 998 (2d Cir. 1985). "[T]he salutary purposes of summary judgment - avoiding protracted, expensive and harassing trials - apply no less to discrimination cases than to commercial or other areas of litigation." <u>Id.</u> "When no

rational jury could find in favor of the nonmoving party because the evidence to support its case is so slight, there is no genuine issue of material fact and a grant of summary judgment is proper." Gallo, 22 F.3d at 1224.

B.  As to the Section 1983

Section 1983 "is not itself a source of substantive rights, but a method for vindicating federal rights elsewhere conferred by those parts of the United States Constitution and federal statutes that it describes." Baker v. McCollan, 443 U.S. 137, 144 n.3, 99 S. Ct. 2689, 61 L. Ed. 2d 433 (1979).  For claims under Section 1983, a plaintiff must prove that "(1) the challenged conduct was attributable at least in part to a person who was acting under color of state law and (2) the conduct deprived the plaintiff of a right guaranteed under the Constitution of the United States."  Snider v. Dylag, 188 F.3d 51, 53 (2d Cir. 1999) (citation omitted).

Section 1983 claims against individuals in their personal capacity pursuant to 42 U.S.C. § 1983 "ordinarily require[ ] that the [defendant] be a supervisor or have some position of authority or control over the plaintiff." Quinn v. Nassau County Police Dep't, 53 F. Supp. 2d 347, 355 (E.D.N.Y. 1999) (citing cases). "Otherwise, it is difficult to establish that the abusive action was perpetrated 'under color of state law' rather than as an essentially private act . . . ." Id. (citation omitted).  Where the individual defendant is merely a co-worker of the plaintiff, such claims are routinely dismissed for failure to state a claim. See id. (dismissing claim against co-employee on grounds that co-employee "was not acting 'under color of state law'"); see also Pugliese v. Long Island R.R., No. 01 CV 7174, 2006 U.S. Dist. LEXIS 66936, at *20-21, 2006 WL 2689600 (E.D.N.Y. Sept. 19, 2006)

(finding that defendant was "a subordinate, not a supervisor, of [the plaintiff], and hence is immune from Plaintiff's § 1983 claims").

The "Plaintiff has not suggested that [Allback, Reeke, Bove, and Braccio] held supervisory authority over her, or that [they] utilized [their] authority or position in sexually harassing her." <u>Williams v. City of New York</u>, 99 CV 2697(ARR)(LB), 2006 WL 2668211, at *28 (E.D.N.Y. Sept. 11, 2006). Therefore, the Court concludes that Allback, Reeke, Bove, and Braccio were not acting under color of state law, and grants summary judgment to these Defendants as to the Section 1983 claims against them.

The Court reaches the same conclusion as to Milone, at least with respect to the Plaintiff's First Amendment retaliation claim against Milone. Indeed, while Milone exercised supervisory authority over the Plaintiff, it is undisputed that he left the shelter one month prior to the position being awarded to Bove and played little if any role as to the promotion. Thus, the Court grants summary judgment to Milone as to the Section 1983 First Amendment claim. However, as explained later, the Court reaches a different conclusion with respect to the Section 1983 Equal Protection Hostile Work Environment claim against Milone.

Further, although Allback, Reeke, Bove, and Braccio may not be held individually liable under Section 1983 for their conduct, the Court may consider their conduct in support of the other claims against the Defendants.

1.  <u>1983 First Amendment Retaliation</u>

The Second Circuit has "described the elements of a First Amendment retaliation claim in several ways, depending on the factual context." <u>Williams v.</u>

Town of Greenburgh, 535 F.3d 71, 76 (2d Cir. 2008). Where a plaintiff is a public employee and brings a Section 1983 claim based on allegations of retaliation for speech or association protected by the First Amendment, as in the present case, the three-part test articulated in Scott v. Caughlin, 344 F.3d 282 (2d Cir. 2003) provides the relevant inquiry. See Martir v. City of New York, No. 07 Civ. 7922, 2009 WL 2191332, at *5 (S.D.N.Y. July 23, 2009).

To establish a *prima facie* case of First Amendment retaliation, a plaintiff must show that (1) the speech or conduct at issue was protected; (2) the defendant took adverse action against the plaintiff; and (3) there was a causal connection between the protected speech and the adverse action. Scott, 344 F.3d at 287. Furthermore, "the causal connection must be sufficient to warrant the inference that the protected speech was a substantial motivating factor in the adverse employment action." Anemone v. Metropolitan Transp. Authority, 410 F. Supp. 2d 255, 267 (S.D.N.Y. 2006) (quoting Morris, 196 F.3d at 110) (internal citations omitted).

If the plaintiff can produce evidence supporting these three elements, a defendant can, nonetheless, prevail on a motion for summary judgment based on two different rationales. First, the defendant can prevail by demonstrating that it would have taken the same adverse action in the absence of the protected speech. See Cotarelo v. Village of Sleepy Hollow Police Department, 460 F.3d 247, 252 (2d Cir. 2006). Alternatively, the defendant can show that the employee's speech was likely to sufficiently disrupt government activities so as to outweigh the First Amendment value of the plaintiff's speech. Locurto v. Giuliani, 447 F.3d 159, 172 (2d Cir. 2006).

If the defendant does so, then the burden shifts back to the plaintiff to demonstrate by competent evidence that "the legitimate reasons offered by the defendant were not its true reasons, but were a pretext for [retaliation]." Patterson v. Cnty. of Oneida, N.Y., 375 F.3d 206, 221 (2d Cir. 2004).

a. Whether the Plaintiff's Speech or Conduct was Protected

If the First Amendment protects public employees from discharge based on what the employee has said, then it must also protect an employee from discharge based on what the employee believes. Branti v. Finkel, 445 U.S. 507, 515, 100 S. Ct. 1287, 1293, 63 L. Ed. 2d 574 (1980). Therefore, unless there is an overriding interest and a vital importance requiring an employee's private beliefs to conform to those of the employers, the employee cannot be retaliated against for her beliefs. Id. at 515-16, 100 S. Ct. at 1293. Furthermore, it is sufficient for the employee to prove that she was retaliated against for the sole reason that she was not affiliated with, or sponsored by, a certain political party. Id. at 517, 515 S. Ct. at 1294 (citing Elrod v. Burns, 427 U.S. 347, 350, 96 S. Ct. 2673, 2678, 49 L. Ed. 2d 547 (1976).

Here, the Plaintiff claims that she exercised a constitutionally protected right when she decided to no longer attend Republican club political meetings and thus not actively engage in the party. The Defendants do not dispute that choosing not to be an active member in the Republican Party is protected conduct. The Supreme Court held in Rutan v. Republican Party of Illinois that "the First Amendment forbids government officials to discharge or threaten to discharge public employees solely for not being supporters of the political party in power." 497 U.S. 62, 64, 110 S. Ct. 2729, 2732, 111 L. Ed. 2d 52 (1990) (citing Elrod v. Burns, 427 U.S. 347, 96

23

S. Ct. 2673, 49 L. Ed. 2d 547 (1976) and Branti v. Finkel, 445 U.S. 507, 100 S. Ct. 1287, 63 L. Ed. 2d 574 (1980)). See DeLeon v. Little, No. 94 Civ. 902, 1999 WL 1490299, *4 (D. Conn. Sept. 29, 1999) (noting that the Supreme Court has made it clear that a public official may not take adverse action against a subordinate for not being a supporter of a political party).

Therefore, the Court finds that the Plaintiff has established that her alleged conduct in not affiliating with a political party is protected activity under the First Amendment.

        b.   Whether the Plaintiff Suffered an Adverse Employment Action

"In the First Amendment context . . . plaintiffs need only show that the retaliatory conduct in question would deter a similarly situated individual of ordinary firmness from exercising his or her constitutional rights." Nixon v. Blumenthal, 409 Fed. App'x 391, 392 (2d Cir. 2010) (quoting Zelnik v. Fashion Inst. of Tech., 464 F.3d 217, 225 (2d Cir. 2006)) (internal citations omitted). "Adverse employment actions include discharge, refusal to hire, refusal to promote, demotion, reduction in pay, and reprimand." Frisenda v. Incorporated Vill. of Malverne, 775 F. Supp. 2d 486, 510 (quoting Morris v. Lindau, 196 F.3d 102, 110 (2d Cir. 1999)). "However, lesser actions may also be considered adverse employment actions." Id. (internal citations omitted); see also Phillips v. Bowen, 278 F.3d 103, 109 (2d Cir. 2002) ("Our precedent allows a combination of seemingly minor incidents to form the basis of a constitutional retaliation claim once they reach a critical mass." (citing Bernheim v. Litt, 79 F.3d 318, 324-25 (2d

Cir. 1996)).  Nevertheless, for "lesser actions" to constitute an adverse employment action, they "must be more disruptive than a mere inconvenience or an alteration of job responsibilities." Kessler v. Westchester Cty. Dep't of Soc. Servs., 461 F.3d 199, 207 (2d. Cir. 2006) (quoting Williams v. R.H. Donnelley Corp., 368 F.3d 123, 128 (2d Cir. 2004)) (emphases omitted).

Here, the Plaintiff proffers evidence that, although she received the highest score on the supervisor test, she was passed over for the supervisor position because she was not actively involved in the Republican Party.  The Defendants do not dispute that the Plaintiff was not promoted, and that the promotion instead went to Bove.  Nonetheless, the Defendants appear to assert that the Plaintiff did not suffer an adverse employment with respect to the position awarded to Guy because Guy was not officially promoted in 2010, but rather, assumed the Kennel Supervisor title in 2012, while the Plaintiff was working at the CSEA.  However, the Court finds that there is at least a triable issue of fact as to whether Bove was given supervisory responsibilities in 2010 while the Plaintiff was still working at the shelter.

The Supreme Court has held that "[e]mployees who find themselves in dead-end positions due to their political backgrounds are adversely affected.  They will feel a significant obligation to support political positions held by their superiors, and to refrain from acting on the political views they actually hold, in order to progress up the career ladder." Rutan, 497 U.S. at 73, 110 S. Ct. at 2736 (emphasis omitted).  Here, after Kohutka was not promoted, she was unable to reach a higher pay grade.

Therefore, the Court finds that the Plaintiff has established, for purposes of these motions, an adverse employment action in that she was passed over for a promotion.

c.  Causal Connection

The Defendants argue that the Plaintiff has failed to establish the requisite causal connection between her protected speech and her being passed over for the promotion.  A causal connection between the speech and the adverse action must exist "so that it can be said that [the action] was a motivating factor in the determination." Morris, 196 F.3d at 110.  A causal connection between the protected speech and the adverse employment action can be established "either indirectly by means of circumstantial evidence, for example, by showing that the protected activity was followed by adverse treatment in employment, or directly by evidence or retaliatory animus." Id.  However, "[t]he plaintiff's initial burden is not insignificant and he [or she] cannot rely solely on the fact that he [or she] was affiliated as a Republican fired by an incoming Democrat administration. Furthermore, it is imperative to show that the defendants knew of the plaintiff's political affiliation." O'Connell v. Gorski, 715 F. Supp. 1201, 1203 (W.D.N.Y. 1989) (internal citations omitted).

A plaintiff may also rely on the temporal proximity of the protected action and the adverse employment action. See Donovan v. Incorporated Village of Malverne, 547 F. Supp. 2d 210, 218 (E.D.N.Y. 2008) (citing Gorman-Bakos v. Cornell Coop. Extension, 252 F.3d 545, 545-55 (2d Cir. 2001)).  In the determination of the existence of a causal connection between the protected speech

and the alleged retaliatory action, the Court is mindful that "[c]ausation generally is a question for the finder of fact." DePace v. Flaherty, 183 F. Supp. 2d 633, 638 (S.D.N.Y. 2002).

In this case, there is sufficient evidence in the record from which to infer that the Plaintiff may have been passed over because of retaliatory animus toward her based on her protected lack of political affiliation. The Plaintiff testified that Milone expressly told her to get involved and be active with the local Republican Party in order to be promoted.

The Defendants assert that Bove and the Plaintiff had a similar relationship to local politics, and thus, there is no basis to conclude that the promotional decision was politically motivated. However, there is evidence that Bove and the Plaintiff's relationship to local politics differed during the time period at issue in this case – namely, when the promotional exam was given and the list released. At that time, the Plaintiff testified, she had ceased all activity within the local Republican party. By contrast, Bove admitted that she became "active" in her local Republican club shortly before she took the promotional exam by becoming a committee person because she knew it was important to be affiliated with a club while seeking a promotion. The Court takes note of the Plaintiff's testimony that Milone told her that Bove was "politically pushing" for the promotion, and "doing all the right things to get the job, becoming a committee person."

The Plaintiff also testified that the individual who the Defendants assert made the promotional decision – Horan – also made comments to the Plaintiff which demonstrated that the Plaintiff's lack of political activity played a substantial

role in the decision to appoint Bove instead of her. In particular, Horan allegedly reiterated that Bove was "pushing politically" for the position, and that the Plaintiff would likely have a "tough time" obtaining the promotion because Bove had become a committee person. Contrary to the Defendants' contention, it is not clear that Horan's statement would be hearsay, as Federal Rule of Evidence 801(d)(2)(D) provides that statements made by a party's agent or employee during the course of the agent-employee relationship, so called "vicarious admissions," are not hearsay.

Further, the Defendants' reliance on Wrobel v. Cnty. of Erie, 692 F.3d 22, 29 (2d Cir. 2012) is misplaced. There, the Second Circuit held that a plaintiff failed to sustain his burden in the summary judgment context as to whether his mistreatment was the result of his lack of political allegiance to a new county administration. The Second Circuit acknowledged that when a new political administration is installed, "it is to be expected that employees will be fired, demoted, or transferred soon after the change in administration, with the result that there is temporal proximity between the change in 'regime' and the adverse employment action." 692 F.3d at 29. However, here, there is no evidence that the Plaintiff's being passed over for a promotion resulted from a customary political turnover. The testimony of Bove and Reeke support the Plaintiff's contention that promotions were based in part on political activity.

In the Court's view, this case resembles Donovan v. Incorporated Village of Malverne, where the court found sufficient evidence "from which to infer that [the Plaintiff] may have been passed over [for a promotion] because of a retaliatory animus toward him." 547 F. Supp. 2d 210, 218 (E.D.N.Y. 2008). The court

determined that multiple supervisors had all suggested "that in order to be promoted, officers were forced to give up their union positions." Id; see Giacopelli v. Incorporated Village of Malverne, No. 09 Civ. 848, 2011 WL 6287852 (E.D.N.Y. Dec. 12, 2011) (Spatt, J.) (finding in a case arising from the same facts as Donovan that there was sufficient evidence to infer a causal connection where Malverne officials suggested that candidates must leave union positions to be promoted).

As multiple supervisors stated in Donovan and Giacopelli to the respective plaintiffs not to partake in certain protected conduct in order to be promoted, here, the Plaintiff testified that Milone encouraged her to get involved and be active with the local Republican Party with the understanding that she would not get promoted without being politically active. Furthermore, the two individuals who were promoted over Kohutka were actively involved in the Republican Party, and both were promoted over Kohutka, even though both received lower grades on the supervisor exam. Thus, the Court finds the Plaintiff has met her burden to show a causal connection between her protected first amendment conduct and her being passed over for a promotion.

d. As to the Defendant's Purported Non-Discriminatory
Reasons for Its Conduct

Having determined that the Plaintiff has established a *prima facie* case, the Court turns to the Defendants' proffer of a legitimate, non-retaliatory reason for taking their action. Indeed, even if a plaintiff has established a *prima facie* case of First Amendment retaliation, a public employer may ultimately avoid liability if it

can demonstrate that it would have taken the same adverse action even absent the protected speech. <u>Anemone</u>, 410 F. Supp. 2d at 265 (citing <u>Mandell</u>, 316 F.3d at 382–83).

The Defendants submit evidence that Bove, while second on the Eligible List, held seniority over the other two candidates. In addition to her seniority, Bove was recommended by Horan. Assistant Town Attorney Susan Jacobs submitted a declaration indicating that there was a concern that the Plaintiff would not make an effective supervisor given her workplace demeanor and the continuing animosity between her and some of her co-workers who would then become her subordinates. (Jacobs Decl. ¶ 8.). The Court finds that the Town has discharged its burden of articulating a non-discriminatory reason for its conduct, and, therefore, the burden thus shifts to the Plaintiff to demonstrate that the Town's justification was a pretext for impermissible retaliation.

The Court finds that the Plaintiff has demonstrated sufficient evidence of pretext. In particular, the Court observes that, while Bove began working for the Town one year prior to the Plaintiff, Bove only became an ACO in 1994. On the other hand, the Plaintiff was promoted to ACO in 1989, and therefore held that position for approximately five years longer than Bove. In fact, the actual promotional list contains a separate column specifically dedicated to "Seniority Credit." (Plf's Exh. A.), which indicates that the Plaintiff had more seniority credit for this position than both Bove and Guy.

As the Supreme Court has held, "[t]he factfinder's disbelief of the reasons put forward by the defendant . . . may, together with the elements of the prima facie

case, suffice to show intentional discrimination." St. Mary's Honor Ctr. v. Hicks, 509 U.S. 502, 511, 113 S. Ct. 2742, 125 L. Ed. 2d 407 (1993); Byrnie v. Town of Cromwell, 243 F.3d 93 (2d Cir. 2001) (summary judgment for defendant was improper where the defendant's stated reasons for its actions lacked credibility due to inconsistencies); Williams v. Regus Mgmt. Grp., LLC, 836 F. Supp. 2d 159, 174 (S.D.N.Y. 2011)("The factfinder may disbelieve the defendant's explanation either because the facts underlying the explanation are false or because the explanation is weakened by inconsistencies or logical flaws.").

As to the Plaintiff's workplace demeanor, the Court notes that such considerations could be equally applicable to Bove who, according to the Plaintiff, tailgated her on one occasion.

In the Court's view, the Plaintiff has identified serious problems with some of the Defendants' justifications for the Plaintiff being passed over for a promotion. Thus, an issue of material fact exists as to whether the Defendants' justifications were a pretext for impermissible First Amendment retaliation under Section 1983.

In sum, the Plaintiff has, for purposes of these motions, established a *prima facie* case for First Amendment retaliation because of her choosing to not be a member of a political party. Her right to so choose is a constitutionally protected activity; being denied a promotion may constitute an adverse employment action; and there is an alleged causal connection between the protected activity and the adverse employment action because the Plaintiff was repeatedly told to join the Republican Party in order to be promoted. The Court further finds that the Defendants have satisfied their burden on summary judgment to advance a

legitimate justification for the adverse employment action, but an issue of fact exists as to whether these justifications were a pretext for impermissible first amendment retaliation. Thus, the motions for summary judgment dismissing the First Amendment retaliation claims against the Town are denied.

2. Section 1983 Equal Protection Hostile Work Environment

The Defendants also seek to dismiss the portion of the Plaintiff's Complaint in which she asserts Equal Protection claims under Section 1983 against the Town and Milone for creating a hostile work environment based upon her gender and political association. See Dawson v. Cnty. Of Westchester, 351 F. Supp. 2d 176, 193 (S.D.N.Y. 2004) ("The Second Circuit has held that claims of sexual harassment, brought under the Equal Protection Clause, are actionable under § 1983.") Lange v. Town of Monroe, 213 F. Supp. 2d 411, 423 (S.D.N.Y. 2002) ("A plaintiff may state a claim under § 1983 for improper sexual conduct that creates a hostile work environment.").

"[T]he Equal Protection Clause bars the government from selective adverse treatment of individuals compared with other similarly situated individuals if 'such selective treatment was based on impermissible considerations such as race, religion, intent to inhibit or punish the exercise of constitutional rights, or malicious or bad faith intent to injury a person.'" Bizzarro v. Miranda, 394 F.3d 82, 86 (2d Cir. 2005) (quoting LeClair v. Saunders, 627 F.2d 606, 609-10 (2d Cir. 1980)). Therefore, a plaintiff does not need to allege membership in a protected class in order to state a claim under the Equal Protection clause.

"Because there are no clearly articulated standards in this Circuit with respect to hostile work environment claims under § 1983, [the Court] must look to Title VII for significant guidance." Dawson, 351 F. Supp. 2d at 194. See Hayut v. State Univ. of N.Y., 352 F.3d 733, 744–45 (2d Cir. 2003) (noting that a § 1983 sexual harassment claim alleging violations of one's Fourteenth Amendment equal protection rights that is based on a "hostile environment" theory, is "governed by traditional Title VII 'hostile environment' jurisprudence"); Piccone v. Town of Webster, No. 09 Civ. 6266, 2011 WL 3322550, at *12 (W.D.N.Y. Aug. 2, 2011) ("The legal standard governing Plaintiff's hostile work environment claim under the Equal Protection Clause is similar to that under Title VII."); Cortes v. City of New York, 700 F. Supp. 2d 474, 487 (S.D.N.Y. 2010) ("Employment discrimination claims under Section 1983 that seek to vindicate a plaintiff's Fourteenth Amendment right to equal protection under the laws are measured against the same standards as are Plaintiff's Title VII hostile work environment and sex and race discrimination claims.").

"Consequently, adapting the standards of Title VII to the Equal Protection Clause, it has been held that a plaintiff makes out an equal protection hostile work environment claim by showing: (1) intentional harassment, (2) based on sex [or political affiliation], (3) under color of state law, that is (4) sufficiently extensive to render the work environment hostile to plaintiff." Dawson, 351 F. Supp. 2d at 194 (citing Lange, 213 F. Supp. 2d at 423.)

Here, there is no dispute that Milone and the Town acted under color of state law for purposes of the hostile work environment claims. Therefore, the issue is

whether the Plaintiff has adequately alleged a hostile work environment intentionally based on her sex or political affiliation. <u>Dawson</u>, 351 F. Supp. 2d at 194 ("Thus, to state an equal protection violation, plaintiffs must demonstrate that: (1) compared with others similarly situated, they were selectively mistreated; and (2) that selective treatment was motivated by an intent to discriminate on an impermissible basis, such as gender.").

In order to state a *prima facie* hostile work environment claim, a plaintiff must plead facts that would tend to show that the complained of conduct: (1) "is objectively severe or pervasive – that is . . . creates an environment that a reasonable person would find hostile or abusive"; (2) creates an environment "that the plaintiff subjectively perceives as hostile or abusive"; and (3) "creates such an environment because of the plaintiff's sex [or exercise of constitutional rights]." <u>Patane v. Clark</u>, 508 F.3d 106, 113 (2d Cir. 2007) (internal citations omitted); <u>Demoret v. Zegarelli</u>, 451 F.3d 140, 149 (2d Cir. 2006) ("Plaintiff must show not only that she subjectively perceived the environment to be abusive, but also that the environment was objectively hostile and abusive.").

a. <u>The Presence of a Hostile Work Environment</u>

To establish a hostile work environment, in general, a plaintiff must show that "the workplace is permeated with discriminatory intimidation, ridicule, and insult, that is sufficiently severe or pervasive to alter the conditions of the victim's employment." <u>Cruz v. Coach Stores, Inc.</u>, 202 F.3d 560, 570 (2d Cir. 2000) (internal quotations omitted). The Supreme Court has observed that courts examining hostile work environment claims should consider "the frequency of the

34

discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." Schiano v. Quality Payroll Sys., Inc., 445 F.3d 597, 605 (2d Cir. 2006) (citing Harris v. Forklift Sys., Inc., 510 U.S. 17, 23, 114 S. Ct. 367, 126 L. Ed. 2d 295 (1993)). "As a general rule, incidents must be more than episodic; they must be sufficiently continuous and concerted in order to be deemed pervasive." Holtz v. Rockefeller & Co., 258 F.3d 62, 75 (2d Cir. 2001). In other words, "[s]imple teasing, offhand comments, and isolated incidents (unless extremely serious) will not amount to discriminatory changes in the terms and conditions of employment." Faragher v. City of Boca Raton, 524 U.S. 775, 788, 118 S. Ct. 2275, 141 L. Ed. 2d 662 (1998).

While single incidents of harassment generally do not create a hostile work environment, a plaintiff may nevertheless survive summary judgment in a case involving an allegation of a single instance of harassment by showing that it is sufficiently severe. See Summa v. Hofstra University, 708 F.3d 115, 126 (2d Cir. 2013) (explaining that Second Circuit case law "establishes that a single incident can create a hostile environment if it is sufficiently severe"); McGullam v. Cedar Graphics, Inc., 609 F.3d 70, 79 (2d Cir. 2010) ("[The plaintiff's] claim nevertheless might survive summary judgment if there were a triable issue as to whether the sole non-trivial incident occurring within the limitations period was itself of sufficient severity to support a hostile work environment claim (albeit a truncated claim premised on that single incident).") (citing Howley v. Town of Stratford, 217 F.3d 141, 148, 153–56 (2d Cir. 2000))); Howley, 217 F.3d at 153–56 ("Usually, a single

isolated instance of harassment will not suffice to establish a hostile work environment unless it was 'extraordinarily severe.' Thus, the plaintiff must demonstrate 'either that a single incident was extraordinarily severe, or that a series of incidents were sufficiently continuous and concerted to have altered the conditions of her working environment.'" (citations omitted)).

In this case, there is evidence in the record that, among other things, the Plaintiff (1) was called a ""f***ing c*nt" in front of several co-workers and supervisors; (2) was falsely accused of grabbing Allback's testicles; (3) was falsely accused of have an affair with Errico; (4) was falsely accused of grabbing Errico's testicles; (5) was spit on by Reeke; (6) was called a "f***ing bitch" by Miranda; (7) had her keys stolen; (8) had her gun box clipped; (9) was tailgated by Bove on a parkway for seven miles; and (10) was frequently physically surrounded by Reeke and others when she would drive into the parking lot in the morning. The Plaintiff suggests that she complained about a number of these instances, such as the tailgating of her car and her number on her gun box tag clipped, but that nothing was done about any of them.

To be sure, "many of the Plaintiff's allegations consist of sporadic conduct over a two and a half year period, some of which are relatively minor. For example, having the number tag on her gun box clipped, standing alone, is undoubtedly insufficient to constitute a hostile working environment. Moreover, even the rumors of Kohutka's extramarital affair, standing alone, would likely not suffice to constitute a hostile working environment." (Mem & Order, at 25.); Faragher, 524 U.S. at 788, 118 S. Ct. at 2283 ("simple teasing, offhand comments, and isolated

incidents (unless extremely serious) will not amount to discriminatory changes in

the terms and conditions of employment") (internal quotations omitted).  As aptly

stated by the Supreme Court:

> These standards for judging hostility are sufficiently demanding to
> ensure that [Section 1983] does not become a "general civility code."
> . . . Properly applied, they will filter out complaints attacking "the
> ordinary tribulations of the workplace, such as the sporadic use of
> abusive language, gender-related jokes, and occasional teasing." B.
> Lindemann & D. Kadue, Sexual Harassment in Employment Law
> 175 (1992) (footnotes omitted).

Faragher, 524 U.S. at 788, 118 S. Ct. at 2283–84.

Nevertheless, as mentioned above, there are a number of factors to consider

in a hostile work environment analysis, including but not limited to the frequency of

the discriminatory conduct; its severity; whether it is physically threatening or

humiliating, or a mere offensive utterance; and whether it unreasonably interferes

with an employee's work performance.  Taken together, the Court finds that the

frequency and severity of the harassment alleged in this case materially altered the

Plaintiff's work environment for the worse.

The Defendants also argue that some of the relevant incidents occurred

outside the work place at union or political events.  As articulated in some Title VII

cases, "'as a general proposition, employers are not responsible . . . for hostile

sexual acts resulting from nonwork-related, off-duty interactions between co-

employees.'" Feliciano v. Alpha Sector, Inc., No. 00 Civ. 9309 (AGS), 2002 WL

1492139, *8 (S.D.N.Y. July 12, 2002) (quoting P. v. Delta Air Lines, Inc., 102

F.Supp.2d 132, 138 (E.D.N.Y. 2000), vacated on other grounds by Ferry v. Delta

Air Lines, Inc., 277 F.3d 128 (2d Cir. 2001)).  However, "[t]he employment

relationship cannot be so finely and facilely parsed.  It comprises multiple dimensions of time and place that cannot be mechanically confined within the precise clockwork and four walls of the office." <u>Parrish v. Sollecito</u>, 249 F. Supp. 2d 342, 351 (S.D.N.Y. 2003)

Moreover, even if the Court were to examine only a portion of the evidence – namely, the on-site incidents such as the confrontation between the Plaintiff and Allback and his subsequent false accusations of unwanted sexual contacts – these would likely be sufficient to establish a hostile work environment.  "These instances subjectively and objectively are of such a nature that one would feel severely humiliated, and would amount to more than mere offensive utterances." (Mem & Order, at 27.); <u>Howley</u>, 217 F.3d at 154 (holding that a coworker's "conduct could reasonably be viewed as having intolerably altered [the plaintiff's] work environment," because although the coworker "made his obscene comments only on one occasion, the evidence is that he did so at length, loudly, and in a large group in which [the plaintiff] was the only female and many of the men were her subordinates").  "The comments and conduct at issue were sexually explicit, offensive, highly derogatory, and publicly made." (Mem & Order, at 27.); <u>Harris</u>, 510 U.S. at 23, 114 S. Ct. at 371 (noting that while a "mere offensive utterance" might not create a hostile environment, conduct which is "humiliating" is more likely to do so).

Finally, Milone claims that he may not be held individually liable for the creation of this alleged hostile work environment.  The Plaintiff concedes that Milone did not "harass" her in any way.  However, the Court finds that a triable

issue of fact exists as to whether Milone, by encouraging the Plaintiff to become involved in the Republican party, directly contributed to the formation of a hostile work environment based on the Plaintiff's political affiliation. The Court further finds that a triable issue of fact exists as to whether Milone contributed to the formation of a hostile work environment based on the Plaintiff's gender by failing to take the appropriate remedial steps in response to the underlying harassment and by for example, telling the Plaintiff to "shrug off" her complaints. This is so even though the Plaintiff acknowledges that (1) Milone never prevented the Plaintiff from filing a formal complaint and (2) lacked the power to sanction, censure, or terminate Shelter employees.

### b. Actions Motivated by Gender and/or Political Affiliation

Again, it is not sufficient for the Plaintiff to merely allege that compared with others similarly situated, she was selectively mistreated by being subjected to a hostile work environment. Rather, to pursue a Section 1983 Equal Protection claim based on a hostile work environment theory, the Plaintiff must also allege that the environment was created because of the Plaintiff's sex and/or political views. In other words, even if the Plaintiff sufficiently alleges the existence of a hostile work environment, she must also provide a basis from which to infer that the Defendants' conduct was directed against her on the basis of her gender and/or political association. See Lange, 213 F. Supp. 2d at 424 ("[P]laintiff provides no basis from which to infer that the Board's conduct was directed against her on the basis of gender. Although the Board members may have been influenced by their personal and political connections to Montanye, this is insufficient to establish a

constitutional violation. . . . [and] may not form the basis for a hostile work environment claim under § 1983.").

As to whether the hostile work environment was created because of the Plaintiff's refusal to become active in the Republican Party, the Court finds that Kohutka has adequately established a basis for this inference. There is evidence in the record that the Plaintiff was encouraged by Milone to be active within the local Republican Party, and it was known among all employees that it was crucial to be so involved in order to advance in their jobs. Moreover, there is evidence that, on one occasion, Milone told Kohtuka that she should join her Town Republican Club and get more involved in the Republican Party in order to be promoted. The Plaintiff testified that, when she declined to do so, in retaliation, she was not promoted. "Therefore, any hostile conduct asserted under the rubric of Equal Protection could reasonably have been directed against her on the basis of this lack of political affiliation." (Mem & Order, at 28.)

With regard to whether the hostile conduct may have also been directed against her on the basis of gender, the Court similarly finds that while not all of the hostile work environment acts appear to be based upon gender, "the confrontation between Kohutka and Allback in April 2008 and his subsequent false accusations of unwanted sexual contact in about June 2008 appear to the Court to be gender-based." (Id.).

"First, the Court finds that if Allback called the Plaintiff a "f***ing [c*unt]" in the workplace in front of multiple supervisors and approximately seven employees, these words unquestionably would have been motivated by the

Plaintiff's gender." (Id. at 29); Steiner v. Showboat Operating Co., 25 F.3d 1459, 1464 (9th Cir. 1994) ("his abuse of female employees, especially Steiner, centered on the fact that they were females. It is one thing to call a woman 'worthless,' and another to call her a 'worthless broad.'"); Galloway v. Gen. Motors Serv. Parts Ops., 78 F.3d 1164, 1168 (7th Cir. 1996) ("The terms 'fucking broads' and 'fucking cunts' are more gendered than 'bitch'") (overruled in part on other grounds by Natl R.R. Passenger Corp. v. Morgan, 536 U.S. 101, 122 S. Ct. 2061, 153 L. Ed. 2d 106 (2002).

"Moreover, although the Defendant argue[] to the contrary, an accusation that a female employee physically grabbed another employee's genitals is undoubtedly sexual in nature and motivated by gender." (Mem & Order, at 29); Alfano v. Costell, 940 F. Supp. 459, 473 (N.D.N.Y. 1996) ("defendants accused her of having a sexual affair with a co-worker and ridiculed her about the affair, . . . All of these incidents were of a sexual nature.") (reversed in part on other grounds, Alfano v. Costello, 294 F.3d 365 (2d Cir. 2002)).

The Defendants assert that a majority of the incidents cited by Kohutka are sex-neutral on their face. For a fact-finder to eventually conclude that this conduct was based upon gender, the Plaintiff will need some circumstantial evidence or other basis to infer that the sexually-neutral acts on their face were in fact discriminatory. However, these instances can nevertheless be asserted now as part of the "totality of the circumstances" that this Court may consider in assessing a *prima facie* case of a hostile work environment. It is sufficient for the Plaintiff to point to some evidence that the non-overtly sexual acts may in fact have been

motivated by her gender, in light of the surrounding circumstances. See Alfano v.

Costello, 294 F.3d 365, 375 (2d Cir. 2002) ("There is little question that incidents

that are facially sex-neutral may sometimes be used to establish a course of sex-

based discrimination-for example, where the same individual is accused of multiple

acts of harassment, some overtly sexual and some not."). "As the Supreme Court

[has] stated . . . , neither 'sex-specific and derogatory terms' nor any evidence that

'sexual desire' motivated the harassment is needed to prove an actionable hostile

work environment." Gregory v. Daly, 243 F.3d 687, 695 (2d Cir. 2001); Howley,

217 F.3d at 145, 148, 154-55 (finding acts of insubordination, dissemination of

untrue rumors about plaintiff, and aspersions on her competence each contributed to

a hostile work environment, based on sex, where plaintiff was the only woman

among 100 firefighters and other harassing conduct referred to her performance of

sexual acts on men).

"Moreover, the Court declines to dissect the various instances of conduct at

issue for purposes of th[ese] motion[s]." (Mem & Order, at 30.) As aptly stated by

the Second Circuit:

> Some of the incidents in this case lend themselves to a distinction,
> which often is dim, between incidents having an overtly sexual
> tone (such as demeaning advances and humiliations that depend
> upon or are sharpened by one's sex), and personnel decisions that
> lack earmarks of bias (earmarks such as unreasonable actions taken
> by persons shown to have engaged in incidents having an overtly
> sexual element, or a peculiar enforcement of personnel rules
> correlated somehow with the claimed ground of discrimination).

Alfano, 294 F.3d at 377. As a general matter, "[i]t is . . . important in hostile work

environment cases to exclude from consideration personnel decisions that lack a

linkage or correlation to the claimed ground of discrimination. Otherwise, the federal courts will become a court of personnel appeals." Id. However, the Court will not dismiss certain instances of the Defendants' alleged conduct at this stage in the proceedings because even if some conduct lacks a sexual component or any reference to the victim's sex, it could, in context, be reasonably interpreted as having been taken on the basis of the Plaintiff's gender. O'Rourke v. City of Providence, 235 F.3d 713, 730 (1st Cir. 2001) ("Courts should avoid disaggregating a hostile work environment claim, dividing conduct into instances of sexually oriented conduct and instances of unequal treatment . . . .").

It is true that, "[i]n cases arising from the break-up of a consensual sexual relationship between coworkers, courts have repeatedly observed that there is a distinction between personal animosity arising from a failed relationship, which is not actionable sexual harassment, and animosity based on a person's gender, which can be." Bracey v. Ne. Utilities Serv. Co., CV126027883S, 2013 WL 6334262, at *9 (Conn. Super. Ct. Nov. 1, 2013); Novak v. Waterfront Commission of New York Harbor, 928 F. Supp. 2d 723, 730–31 (S.D.N.Y. 2013) (mistreatment by former supervisor following breakup of consensual sexual relationship, and mistreatment by other supervisors whose attitudes were affected by former supervisor's, "while unfair and unfortunate, does not constitute Title VII sex discrimination under existing law"); Conklin v. Suffolk, 859 F. Supp. 2d 415, 428 (E.D.N.Y. 2012) ("Courts often find that harassment by a co-worker is not considered to be 'based on sex' when it arises from a failed relationship" (citing cases)); Stepheny v. Brooklyn Hebrew School for Special Children, 356 F. Supp. 2d 248, 263 (E.D.N.Y.

2005) ("Conduct motivated by personal animosity does not run afoul of Title VII's prohibition against altering the terms and conditions of employment because of sex"); West v. MCI Worldcom, Inc., 205 F. Supp. 2d 531, 545 (E.D. Va. 2002) ("Courts have consistently drawn the distinction between 'actions based on discriminatory animus and those based on personal animosity resulting from failed consensual relationships.'")(quoting Pipkins v. City of Temple Terrace, Florida, 267 F.3d 1197, 1199 (11th Cir. 2001)); Campbell v. Masten, 955 F. Supp. 526, 530 (D. Md. 1997) ("[N]egative employment actions which follow on the heels of a consensual relationship gone sour do not constitute quid pro quo sexual harassment unless they are linked in some way to other or further 'unwanted' sexual advances").

Here, the Plaintiff disputes that she ever engaged in a sexual relationship with Allback. Thus, at the least, the Court finds that the Plaintiff's alleged relationship is a disputed issue of material fact. In any event, there is no *per se* bar against hostile work environment claims based on gender that arise, whether entirely or not, out of a failed consensual relationship. "To hold otherwise would effectively immunize from Title VII liability any sexual harassment following a failed relationship." Sclafani v. PC Richard & Son, 668 F. Supp. 2d 423, 433 (E.D.N.Y. 2009); Forrest v. Brinker Intern. Payroll Co., LP, 511 F.3d 225, 230 (1st Cir. 2007)("Nowhere does prior case law suggest that certain types of discriminatory behavior, held to constitute gender-based harassment in other cases, may not constitute gender-based harassment when the parties had previously engaged in a romantic relationship."); accord Perks v. Town of Huntington, 251

F.Supp.2d 1143, 1157 (S.D.N.Y. 2003) ("Boiled down to its essence, [defendant's] argument would mean that once a supervisor has engaged in a consensual relationship with an employee, he subsequently has *carte blanche* to harass that employee with impunity, even though the same behavior with respect to any other employee would constitute a Title VII violation. This argument makes little sense – prudentially or legally – and the Court rejects it.").

Therefore, the Court concludes that, even if the Plaintiff previously engaged in a sexual relationship with Allback, if the Plaintiff presents evidence that the relationship was terminated and thereafter pervasive harassment of a sexual nature continued over a substantial period of time despite complaints to supervisors, the existence of the prior relationship would not preclude a hostile work environment claim under Title VII, as a matter of law.

Furthermore, the Plaintiff's hostile work environment claim is based not only on Allback's conduct following an alleged failed relationship, but also on alleged harassment by Reeke, Bove, and Miranda, which while gender-neutral on its face, could be interpreted, in conjunction with the otherwise plainly sex-based incidents, as related to the Plaintiff's gender.

In short, drawing all reasonable inferences in favor of the Plaintiff, the Court concludes that material issues of fact exist as to the Plaintiff's Section 1983 Equal Protection Hostile Work Environment claim based upon her lack of political involvement and her gender.

C.  As to Monell Employer Liability

In addition, the Defendants argue that the Town may not be held liable for Kohutka's Section 1983 First Amendment retaliation and Equal Protection Hostile Work Environment claims.

"[A] municipality cannot be held liable pursuant to § 1983 solely because of the discriminatory actions of one of its employees." Back v. Hastings On Hudson Union Free Sch. Dist., 365 F.3d 107, 128 (2d Cir. 2004)(citing Monell v. Department of Social Services, 436 U.S. 658, 691, 98 S. Ct. 2018, 56 L. Ed. 2d 611 (1978)(rejecting *respondeat superior* liability in the § 1983 context)).  Therefore, the Town can only be held liable if its "policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury." Monell, 436 U.S. at 694, 98 S. Ct. 2018.  To succeed on this claim, the Plaintiff must show that, pursuant to the well-settled law of Monell, 436 U.S. at 692–94, 98 S. Ct. 2018 and its progeny, "the challenged acts were performed pursuant to a municipal policy or custom." Patterson, 375 F.3d at 226. See e.g., Rookard v. Health and Hosps. Corp., 710 F.2d 41, 45 (2d Cir. 1983) ("Where an official has final authority over significant matters involving the exercise of discretion, the choices he makes represent government policy.").

To show a policy, custom, or practice:

the plaintiff need not identify an express rule or regulation.  See, e.g., Sorlucco v. New York City Police Department, 971 F.2d 864, 870 (2d Cir. 1992).  It is sufficient to show, for example, that a discriminatory practice of municipal officials was so "persistent or widespread" as to constitute "a custom or usage with the force of law," id. at 870-71 (internal quotation marks omitted), or that a discriminatory practice of subordinate employees was "so manifest

as to imply the constructive acquiescence of senior policy-making officials," id. at 871; see, e.g., Gierlinger v. New York State Police, 15 F.3d at 34 ("Section 1983 liability can be imposed upon individual employers, or responsible supervisors, for failing properly to investigate and address allegations of sexual harassment when through this failure, the conduct becomes an accepted custom or practice of the employer.").  A policy, custom, or practice may also be inferred where "the municipality so failed to train its employees as to display a deliberate indifference to the constitutional rights of those within its jurisdiction."  Kern v. City of Rochester, 93 F.3d 38, 44 (2d Cir. 1996), cert. denied, 520 U.S. 1155, 117 S. Ct. 1335, 137 L. Ed. 2d 494 (1997) (internal quotation marks omitted).

Patterson v. County of Oneida, N.Y., 375 F.3d 206, 226 (2d Cir. 2004).

With regard to the First Amendment retaliation claim, the Defendants argue that the Plaintiff's allegations that Milone encouraged her to be involved and active within the Republican party, and that it was known among all employees that it was crucial to be involved in order to advance, are insufficient rumor or innuendo that does not provide any factual basis to support a claim that the Town actually has a policy or practice of discrimination.  However, the Court finds that there is evidence in the record establishing a discriminatory practice of officials that was so persistent or widespread as to constitute a custom or usage.  The Plaintiff testified that representatives of the Town encouraged her to get involved and be active within the local Republican Party, and that it was known among all employees that advancement depended in part on politics.

With regard to the Plaintiff's Equal Protection Hostile Work Environment claim, an employer will be held liable for a hostile work environment in the workplace when the employer knows of the hostile work environment but fails to take appropriate remedial steps. See Duch v. Jakubek, 588 F.3d 757, 763 (2d Cir.

2009) ("Despite offering a reasonable avenue of complaint to plaintiff, employer defendants can still be held liable if plaintiff can show that they 'knew, or in the exercise of reasonable care should have known, about the harassment yet failed to take appropriate remedial action.'")(quoting <u>Howley v. Town of Stratford</u>, 217 F.3d 141, 154 (2d Cir. 2000))). The Court analyzes whether an employer's remedial actions were sufficient based on the totality of the circumstances. <u>Id.</u> (citing <u>Distasio v. Perkin Elmer Corp.</u>, 157 F.3d 55, 63 (2d Cir. 1998)).

In the present case, the record indicates that the Plaintiff was called a sexually explicit and derogatory term in the workplace in front of multiple supervisors as well as several employees, but Allback was never suspended or reprimanded for this behavior. There is also evidence that, although the Plaintiff was suspended without pay for three days after Allback's accusations regarding her unwanted sexual contact, these charges were eventually dismissed in their entirety and her suspension was reversed. Nevertheless, Allback was not disciplined in any way for making these false allegations. There is also evidence that Milone simply dismissed the Plaintiff's complaints, telling her to "shrug it off." The Court finds that this evidence may demonstrate that Town knew, or in the exercise of reasonable care should have known, about these instances of harassment, yet failed to take appropriate remedial action.

To be sure, there is evidence that the Plaintiff did not specifically report that she was being treated in a negative way by co-employees because of her gender or political involvement and the Town did take some steps to rectify the worsening

situation, including conducting individual meetings with the relevant players after the April 16, 2008 incident.

However, viewed cumulatively, it becomes clear to the Court that disputed issues of material fact exist as to whether (1) the discriminatory practice of officials was so persistent or widespread as to constitute a custom or usage and (2) the Town satisfied its obligations under Section 1983 in responding to the alleged hostile work environment.

D.  State Law Claims

Finally, the Defendants raise arguments as to why the Plaintiff's state law claims should be dismissed.

To the extent the Plaintiff raises a claim under the Nassau County Human Rights Law, that law does not provide a right of action and, therefore, that claim is dismissed. Chesney v. Valley Stream Union Free Sch. Dist. No. 24, 05 CIV 5106 (DRH)(ETB), 2007 WL 1288137, at *4 (E.D.N.Y. Apr. 30, 2007)

The Plaintiff also asserts a state law hostile work environment claim based on her gender and predicated upon the NYHRL which provides, in pertinent part, that "it shall be unlawful discriminatory practice (a) for an employer . . . because of an individual's age, race, creed, color, national origin, sexual orientation, military status, [or] sex, . . . to discharge from employment such individual in compensation or in terms, conditions or privileges of employment." N.Y. Exec. Law. § 296(a). "A supervisor is an 'employer' for purposes of establishing liability under the [NYHRL] if that supervisor actually participates in the conduct giving rise to [the]

discrimination." Feingold v. New York, 366 F.3d 138, 157 (2d Cir. 2004) (internal citation omitted).

The standards for evaluating claims arising under Section 1983 and the NYSHRL are identical for hostile work environment claims. See Weinstock v. Columbia Univ., 224 F.3d 33, 42 n. 1 (2d Cir. 2000); Smith v. Town of Hempstead Dep't of Sanitation Sanitary Dist. No. 2, 798 F. Supp. 2d 443, 451 (E.D.N.Y. 2011) (Spatt, J.) ("The standard for showing a hostile work environment under Title VII, Section 1981, Section 1983, and the New York State Human Rights Law is essentially the same."); Davis v. Oyster Bay–East, No. 03 Civ. 1372, 2006 WL 657038, at *8, n. 12 (E.D.N.Y. Mar. 9, 2006), aff'd, 220 Fed. Appx. 59 (2d Cir. 2007) ("discrimination claims under Title VII, 42 U.S.C. §§ 1981 and 1983, and NYHRL § 296 are analyzed together, as the same analytic framework applies to each").

Having concluded that a triable issue of fact exists as to the Plaintiff's 1983 Equal Protection Hostile Work Environment claims as against Milone and the Town, the Court similarly finds that a triable issue of fact exists as to the Plaintiff's NYSHRL claims against Milone and the Town.

Further, unlike Section 1983, the Second Circuit has also held that this statute "allow[s] a co-worker who 'actually participates in the conduct giving rise to a discrimination claim' to be held liable under the [NYSHRL] even though that co-worker lacked the authority to either hire or fire the plaintiff." Feingold v. New York, 366 F.3d 138, 157-58)(2d Cir. 2004) (quoting Tomka v. Seiler Corp., 66 F.3d 1295, 1317 (2d Cir. 1995); Petrosky v. New York State Dep't of Motor Vehicles, 72

F. Supp. 2d 39, 65 (N.D.N.Y. 1999) (noting that the "vast majority of federal courts to have considered the question have followed <u>Tomka</u> "); <u>Murphy v. ERA United</u>, 251 A.D.2d 469, 674 N.Y.S.2d 415 (2d Dep't 1998) (clarifying, after an earlier decision cast doubt on plaintiffs' ability to sue co-workers under the aid-and-abet provision, that co-employees may be held liable for aiding and abetting the discrimination of an employer so long as the employer itself is susceptible to suit); <u>D'Amico v. Commodities Exch., Inc.</u>, 235 A.D.2d 313, 652 N.Y.S.2d 294 (1st Dep't 1997) (calling the availability of this cause of action "settled precedent in [the First] Department").

The Defendants maintain that the Allback and Reeke were not individually involved in the underlying conduct. In the Court's view, these claims are without merit. As to Allback, the record indicates that he (1) called the Plaintiff a "f***ing c*nt" in front of several co-workers and supervisors; (2) falsely accused the Plaintiff of grabbing his testicles; (3) accused the Plaintiff of scratching his car; and (4) accused the Plaintiff of circulating the anonymous letters. The fact that the Plaintiff admittedly sought to provoke Allback on April 18th, 2008 does not absolve Allback from liability for a hostile work environment claim under the NYHSRL. Indeed, the Court notes that Allback apparently lodged his complaint of sexual assault against the Plaintiff ten months after the subject incident. In light of this evidence, the Court finds that a triable issue of fact exists as to whether Allback was a participant in the alleged hostile work environment surrounding the Plaintiff. Accordingly, the Court denies the Defendants' motion for summary judgment with respect to the NYSHRL claim against Allback.

As to Reeke, the record indicates that there is evidence that she regularly spat at the Plaintiff when she walked by, and, as a means of intimidation, surrounded the Plaintiff's car with her friends when the Plaintiff parked her car in the morning. There is also evidence that Reeke falsely accused the Plaintiff of sleeping with Errico and of grabbing Errico's testicles, and stole the Plaintiff's car keys. Taken together, the Court finds that the Plaintiff has produced sufficient evidentiary proof that Reeke was a participant in creating a hostile work place environment based on the Plaintiff's gender. Accordingly, the Court denies the Defendants' motion for summary judgment with respect to the NYSHRL claim against Reeke.

However, tellingly, the Plaintiff's brief in opposition makes no argument with regard to whether Bove or Braccio should be held individually liable under the NYSHRL. Thus, the Court considers this argument abandoned and dismisses the complaint to the extent the Plaintiff asserts NYSHRL claims against Bove and Braccio. Uebler v. Boss Media AB, 432 F. Supp. 2d 301, 304-05 (E.D.N.Y. 2006).

### III. CONCLUSION

For the foregoing reasons, it is hereby

ORDERED that the Defendants' motion for summary judgment pursuant to Fed. R. Civ. P. 56 is granted to the extent that the Court (1) dismisses the Plaintiff's Section 1983 First Amendment Retaliation claims against Milone, Allback, Reeke, Bove, and Braccio in their individual capacities; (2) dismisses the Section 1983 Equal Protection Hostile Work Environment claims against Allback, Reeke, Bove, and Braccio in their individual

capacities; (3) dismisses the Nassau County Human Rights Law claims against the Defendants with prejudice; (4) and dismisses the New York State Human Rights Law claims against Bove and Braccio; and it is further

ORDERED, that the Defendants' motion for summary judgment is denied in that the Court finds that material issues of fact exist as to the Plaintiff's (1) Section 1983 First Amendment Retaliation claims against the Town; (2) Section 1983 Equal Protection Hostile Work Environment claims against the Town and Milone; and (3) New York State Human Rights Law claims as to the Town, Milone, Allback, and Reeke. Accordingly, the Defendants' motions for summary judgment dismissing these causes of action are denied.

**SO ORDERED.**

Dated: Central Islip, New York
January 29, 2014

*Arthur D. Spatt*
ARTHUR D. SPATT
United States District Judge
